*In re* José A. Clavell Ruiz, querellado.

Número: O-75-183        Resuelto: 29 de septiembre de 1977

*Miriam Naveira de Rodón, Procuradora General, Ronaldo Rodrí-*
*guez Ossorio, Procurador General Auxiliar,* abogados de El
Pueblo; *José A. Clavell Ruiz,* por derecho propio, *Roberto de*
*Jesús Cintrón,* abogado del querellado.

PER CURIAM: El Informe del Comisionado Especial Hon.
José Dávila Ortíz, transcrito literalmente consigna:

"Por resolución del Honorable Tribunal Supremo de Puerto
Rico de 7 de marzo de 1975 se ordenó la formulación de que-
rella contra el abogado José A. Clavell Ruíz [*sic*] imputándole
conducta profesional impropia. Dicha querella se radicó el día 10
de abril de 1976 por la Procuradora General de Puerto Rico,
conteniendo tres cargos que en lo pertinente, textualmente, leen
así:

'*PRIMER CARGO:* El querellado, José A. Clavell Ruíz, ha
observado una conducta inmoral e impropia y en violación a la
responsabilidad social y profesional de los abogados, el Canon 37
del Código de Etica Profesional y a la conducta moral que se
espera de todo miembro de la profesión legal en sus relaciones
con sus clientes y hacia los tribunales al haber seguido la prác-
tica en un número de casos de ser simultáneamente abogado de
la defensa y apoderado de una compañía que prestaba fianzas
en dichos casos.

'*SEGUNDO CARGO:* El querellado, José A. Clavell Ruíz,
observó una conducta inmoral, impropia y en violación a la res-
ponsabilidad social y profesional de los abogados y a la conducta
moral que se espera de todo miembro de la profesión legal en su
relación con su cliente don Eddie López Pacheco. Esta conducta
consistió en lo siguiente:

'El Sr. Eddie López Pacheco acudió a las oficinas del Lic.
José A. Clavell Ruíz para solicitar de éste que gestionara en su
carácter de apoderado de la Compañía de Fianzas de Puerto
Rico una fianza para obtener su libertad provisional en lo que se

ventilaba un caso criminal instado contra él. Con el alegado propósito de obtener una garantía por la fianza el querellado le exigió al Sr. López Pacheco que otorgara un contrato de compraventa en el cual traspasaba al querellado la propiedad de un inmueble ubicado en el Municipio de Guayanilla. A pesar de que en el contrato aparece como precio de venta la suma de $2,500.00, el querellado no le entregó al Sr. López Pacheco esa suma. No obstante el referido acuerdo, el querellado, sin autorización del Sr. López Pacheco, hizo gestiones para la venta de la casa, de lo que fue impedido por las gestiones de éste. El querellado no actuó en la defensa del Sr. López Pacheco. El Sr. López Pacheco le pidió al querellado que le devolviera la propiedad y éste se rehusó.

'TERCER CARGO: El querellado, José A. Clavell Ruíz, observó una conducta inmoral e impropia y en violación a la responsabilidad social y profesional de los abogados y a la conducta moral que se espera de todo miembro de la profesión legal, en sus relaciones con su cliente Don Leocadio Bonilla Sánchez. Esta conducta consistió en lo siguiente:

'El Sr. Bonilla Sánchez se hallaba recluido en la Cárcel de Distrito de Ponce, cuando obtuvo nueva prueba tendente a establecer su inocencia. La trabajadora social de dicha institución, Sra. Aida Millán le informó al querellado sobre ese caso, y éste se ofreció voluntariamente a darle sus servicios profesionales gratuitamente. Luego de una entrevista con Bonilla, el querellado se enteró que aquél tenía una casa y le ofreció hacer las gestiones para la venta de su inmueble, informándole que le cobraría el 15% de su valor como comisión por la venta y como pago de sus honorarios. Como resultado de ese acuerdo, el Lic. Clavell trajo al Sr. Bonilla las escrituras de la venta de la casa la cual se celebró por la suma de $7,500.00. Transcurrieron tres semanas luego de otorgarse las escrituras y Bonilla no tuvo noticias del querellado. Este le respondió que se le adeudaba $750.00 como comisión por la venta de la casa y $50.00 por los gastos de la escritura, y que además cobraría $2,500.00 por sus servicios como abogado. Ante esta situación Bonilla se comunicó con la Sra. Millán, quien a su vez se comunicó con el Superintendente de la cárcel, Sr. Tomás Alcalá, quien concertó una entrevista con el Lic. Clavell. En esa ocasión el Sr. Alcalá le pidió una explicación de lo ocurrido, y éste se reiteró en lo antes dicho. A 18 de junio de 1974 envió al Sr. Alcalá una carta y un cheque por la suma de $6,700.00 a favor del Sr. Bonilla. Esa suma se desglosó de la

siguiente manera: $7,500.00 por la venta de la casa, menos $750.00 por "gastos de trámite" y $50.00 por "gastos de escrituras". El querellado en ningún momento ha rendido labor profesional alguna a favor de Bonilla, ni le ha devuelto el dinero que le cobrara con el pretexto de rendirle tales servicios.'

El querellado presentó una contestación exponiendo, textualmente, lo siguiente:

### 'PRIMER CARGO

'Se rechaza este cargo por ser indeterminado, vago e impreciso. Se refiere a generalidades imprecisas y no a casos concretos que dieren la oportunidad de demostrar que no se infringió canon de ética alguno ni que se haya incurrido en conducta inmoral e impropia.

'Dicho cargo no expone hechos que justifiquen que se tomen medidas disciplinarias de clase alguna contra el querellado.

'Que en las ocasiones en que el querellado ha actuado como abogado de una persona y como apoderado de la compañía de fianzas, ha habido una relación previa de abogado-cliente, o amistad con cliente, relacionados o amigos, o se ha interpuesto recurso de hábeas corpus, o radicado moción de rebaja de fianza con anterioridad o porque los servicios se han rendido en forma gratuita.

'Que nuestra actividad profesional no difiere de la de cualquier otro compañero de la localidad, siendo a todas luces normal y acorde con la ética de la profesión.

'Que nuestra participación en este tipo de actividad representa un servicio útil y necesario que se ha ofrecido por varios años a todos los abogados del área y a la comunidad en general en forma eficiente y confiable, siendo en la actualidad la compañía que representamos la única compañía de fianzas que opera en el área.

'Que sin que nos expliquemos por qué, es lo cierto en el distrito judicial de Ponce se sigue la práctica de que es el propio Tribunal de Distrito el que mediante el uso de una forma que se designa como OAT-939 nombra los abogados que deben asistir a los acusados, recayendo comúnmente en los de Asistencia Legal o a cualquier otro abogado de su preferencia. Que en la mayoría de los casos en que hemos asumido la representación de algún acusado es el propio tribunal el que nos ha designado en la etapa de vista preliminar por deseos del propio acusado.

'Que la actuación del querellado con relación a la compañía de fianzas, es meramente la de suscribir los contratos de fianza que vengan ante su consideración, no teniendo responsabilidades ulteriores para dicha compañía.

## 'SEGUNDO CARGO

'Se niega que el querellado observara conducta impropia con el cliente Eddie López Pacheco. La totalidad de los hechos expuestos en el cargo, no sólo son falsos, sino que también maliciosamente fabricados e indebidamente expuestos en la querella, a pesar de que el querellado sometió oportunamente a la Oficina del Procurador General las copias de documentos y récords oficiales provenientes de expedientes del tribunal de primera instancia, que desvirtúan y destruyen por completo la infundada relación de hechos expuesta en el cargo. Con muy poco esfuerzo, fácilmente se corroborarían tales documentos en el Tribunal Superior de Ponce.

'Se niega que Eddie López Pacheco acudiera a las oficinas del querellado. Sencillamente no podía acudir porque estaba preso. El querellado le visitó en la Cárcel de Distrito de Ponce a instancias de varios empleados de labor social de la institución, uno de ellos el Sr. Rafael Cora.

'Se niega que López solicitara una fianza al querellado. Lo que solicitó fue que se le gestionara la reducción de la fianza que se le había fijado en $25,000.00 por alegada violación a una hijastra, y a ese efecto, el 30 de mayo de 1974 radicamos una petición de "habeas corpus", la cual se vio el 13 de junio y se logró se redujera la fianza a $3,000.00. Ese mismo día y a la misma hora, en vista preliminar, le habían aumentado la fianza a $45,000. El querellado no compareció porque no sabía de tal señalamiento.

'Se niega que el contrato privado de compraventa se hiciese para obtener una garantía por la fianza. Nunca dudamos de la honestidad de López y no había por qué exigirle garantía que en todo caso tenía que ser para la compañía de fianzas. La realidad fue que la compraventa fue una dación en pago de nuestros servicios profesionales y si se le dio la forma de compraventa fue para aprovechar unos modelos o formas existentes. El Sr. López alegaba que tenía otra casa y que prefería pagar los servicios del querellado con esa casa, porque así podía deshacerse de la concubina y de sus hijastras que afirmaba "le habían hecho

un rancho". El querellado no tenía que entregar dinero alguno al Sr. López porque la cantidad que aparece en la compraventa era la misma en que ambos habían convenido que serían los honorarios del querellado por defenderle.

'Tampoco el Sr. López entregó dinero alguno al querellado pues ese era su problema principal ya que ni él ni sus familiares tenían efectivo alguno para pagar al querellado. El Sr. López envió a un hermano a buscar $120 que tenía retenidos en su empleo de guardia de seguridad en Union Carbide de Guayanilla y sucedió que no apareció ni el hermano ni el dinero. Como habíamos estado bregando con la difícil situación de López junto al Sr. Cora y otros, sin poder aliviarle la misma y como creíamos de buena fe que este señor no podía solucionar sus problemas estando preso, situación que conllevaba además la posible pérdida de su trabajo, fue que para conseguir el dinero que decía tenía retenido, accedimos al pedido de los oficiales sociales y de López y se le suscribió fianza para que él en libertad, personalmente consiguiera el dinero.

'En el contrato que se hizo como de compraventa pero que fue una dación en pago aparece el precio de venta de $2,500 porque precisamente esa cantidad representaba el valor de nuestros servicios por la defensa de ese señor en la causa criminal. ¿Por qué había que devolverle dinero alguno?

'Se niega que el querellado no estuviese autorizado a hacer gestiones para la venta de la casa. No sólo estaba autorizado mediante el propio contrato, sino que López pidió dos semanas para desocupar la casa y el querellado decidió darle sesenta días, tiempo que estimó estarían cumplidos sus servicios. La primera gestión de venta de la casa se hizo dos o tres días después de la firma del contrato al enviarse una persona a instalar un rótulo para la venta de la casa. El Sr. López no objetó nada, ni dijo nada, fue un vecino el que alegó que la casa no se podía vender porque no era de López. El querellado recibió la información del instalador del rótulo y se comunicó con López. Suman muchas las ocasiones en que López ha admitido que dicha casa no es de él. Si así resultó en definitiva, ¿quién fue el engañado?

'Se niega que el querellado no actuara en la defensa de López. Hasta el 21 de agosto de 1974 el querellado asistió en su defensa al acusado y aparecía como abogado de récord. Hay citaciones, comparecencias para suspensiones y una minuta donde el propio Eddie López Pacheco le informa al Tribunal que su abogado es

el querellado. En dos ocasiones López llevó declaraciones juradas de su concubina, ya que aparentemente se habían reconciliado, y tuve que negarme a notarizarlas por entender que no era de su propia voluntad lo que había allí escrito. Este señor iba a menudo a mi oficina para tratar sobre el caso y su empleo y a pesar de que sabíamos de labios de él que la casa no era suya decidimos continuar representándolo.

'Sin haber renunciado nosotros la representación, compareció en autos la firma Baragaño & Zayas compuesta de los Lic. Rafael Baragaño y el ex-fiscal Lic. Héctor Zayas Puig, haciéndose cargo del caso hasta su final.

'Se niega que el Sr. López Pacheco pidiera al querellado que le devolviera la propiedad. ¿Qué propiedad, si resultó que no era dueño? Por otra parte, tampoco el querellado nunca ha tenido dominio o posesión de la misma. Lo que el Sr. López solicitó fue le devolviese el documento de la supuesta compraventa y lo hizo mucho antes de que se terminara su caso, lo que descarta su alegación de "que fuese en garantía de fianza." El querellado rehusa devolver tal documento, no porque tuviere interés en la propiedad que de hecho no tenía, sino porque su interés es que se dilucide que no hubo tal compraventa. El querellado no adquirió nada, porque López nada tenía y nadie puede transmitir lo que no tiene. A su vez, tampoco puede el querellado transmitir lo que no adquirió y así se lo ha hecho saber en varias ocasiones al Sr. López.

### 'TERCER CARGO

'Se niega que el querellado observara conducta impropia alguna en relación con su cliente Leocadio Bonilla Sánchez.

'Es correcto que a petición de la Sra. Aida Millán el querellado visitara al Sr. Bonilla para ayudarle en un caso de incesto del cual había sido convicto. No se llegó a acuerdo alguno sobre servicios gratuitos ni algo por el estilo porque la situación de Bonilla exigía un recurso en que se hacía necesario tomar declaraciones juradas y presentar ante el Tribunal a varios de sus familiares que se encontraban en Estados Unidos y no había dinero para la transportación de ellos a Puerto Rico por lo que el recurso quedó pendiente.

'Luego de hablar sobre los hechos, el Sr. Bonilla le planteó al querellado que tenía una propiedad en la Barriada Jaime L. Drew de Ponce, abandonada y sin terminar y que si podía gestionar su venta. Se convino que el querellado tramitaría la venta,

pondría anuncios en el periódico, instalaría un rótulo en la propiedad y el precio de venta fluctuaría entre un máximo de $8,000.00 y un mínimo de $6,000. Los honorarios se estipularon serían alrededor de un 15% de las resultas de la venta de la propiedad, según acuerdo firmado y autorizado por el Sr. Bonilla.

'Como para aquel tiempo la venta de propiedades resultaba difícil, tardó varios meses en hacerse la transacción pues aun cuando venían muchas personas interesadas a la oficina resultaba que no tenían el dinero y a otras se le preparaban documentos para el Banco de la Vivienda y no cualificaban. A tal extremo llegó la situación, que en una ocasión informó el Sr. Bonilla al querellado que la diera por el mínimo de $6,000. Varios días después al querellado le visitó el Sr. Maximiliano Torres quien ofreció y pagó $7,500 por la propiedad el 5 de julio de 1974.

'Una vez hecha la venta, el Sr. Bonilla le manifestó al querellado que interesaba que el dinero que le correspondía se le entregase a un compadre suyo que vivía en la Urbanización La Guadalupe de Ponce, quien visitaría al querellado en su oficina. El compadre visitó la oficina del querellado el 10 de julio y en la entrevista el querellado se dio cuenta que el tal compadre no reunía las garantías necesarias para confiarle tal cantidad, por lo que el querellado le notificó a Bonilla que iba a depositar su parte correspondiente en la Cárcel de Distrito de Ponce para asegurarse de que ese dinero estaría protegido y disponible para el uso del confinado. La información se la envió a través de la Sra. Aida Millán, notificándole también que le cobraría el 15% acordado por el trámite, $50 por la escritura y si interesaba en comenzar el recurso se lo haría por $2,500.

'El 15 de julio, o el 16, a petición del Sr. Tomás E. Alcalá nos reunimos el Sr. Bonilla, el Sr. Alcalá, la Sra. Millán y el querellado. Después de un breve intercambio que no duró ni diez minutos, nos pusimos de acuerdo las partes, acordándose rebajar los gastos de trámite a un 10% a instancia del Sr. Alcalá, y tanto el querellado como el Sr. Bonilla aceptaron también los $50.00 por los gastos notariales de la escritura y el Sr. Bonilla no aceptó en que el querellado comenzara el recurso, alegando que los honorarios por $2,500 eran altos. Todo terminó en armonía. Bonilla nunca reclamó dinero alguno al querellado ni de palabra o por escrito. Afirma el propio Sr. Bonilla que él no ha hecho reclamación a nadie sobre esta transacción. A el Sr. Tomás

E. Alcalá entregó el querellado el 18 de julio un cheque por $6,700 para que se le depositara en la cuenta del Sr. Bonilla, habiéndosele descontado $750 por gastos en el trámite de la venta y $50 por la escritura, tal como se había convenido. A los pocos días el Sr. Bonilla salió en libertad bajo palabra.

'El querellado recuerda además que en la entrevista sostenida el 15 ó 16 de julio, el querellado dio específicamente la razón por la cual entendía que el compadre de Bonilla no debía tener bajo su custodia el dinero; admitió al querellado que le habían cortado el servicio telefónico por falta de pago. El propio Sr. Alcalá, Superintendente de la institución, estuvo de acuerdo con el querellado que lo más conveniente para Bonilla era que su dinero se depositase en una cuenta en la institución y así se hizo.

### 'DEFENSAS AFIRMATIVAS:

'1. Que la queja que dio base a la formulación de los cargos al querellado no fue jurada.

'2. Que la queja fue establecida a través de una Resolución del Hon. Arturo Cintrón García donde el querellado no era parte ni había intervenido por lo que se le privó desde el primer momento de su derecho a cuestionar lo expuesto en la misma.

'3. Que tal resolución dictada por el Hon. Juez Arturo Cintrón García es una prolongación de una serie de ataques sistemáticos hechos por dicho magistrado al sentirse personalmente molesto por haber el querellado actuado en la defensa del caso de Pueblo v. Roberto Arocho Maldonado por asesinato en primer grado y ataque p/c asesinato y varias infracciones a la Ley de Armas, el cual se encuentra en etapa de apelación. Que en dichos casos el querellado al percatarse de una serie de anormalidades ocurridas dentro y fuera del proceso que perjudicaban sustancialmente los derechos de su cliente, los puso en conocimiento del Hon. Juez Cintrón García a través de una moción de nuevo juicio y éste se sintió tan personalmente ofendido que no quiso entender en la vista, testificó en la moción de nuevo juicio que fue celebrada un año después de radicada y amenazó e injurió al querellado a tal extremo que el Lic. Pedro Malavet Vega tuvo que pedirle protección al tribunal que presidía el Hon. José Ramón Gautier.

'4. Que una vez concluída la vista sobre moción de nuevo juicio y dictada resolución adversa a nuestro cliente, radicamos

la correspondiente apelación ante este Hon. Tribunal Supremo y se nos ha forzado a abandonar la apelación con el calculado fin de impedir que planteemos ante esta Superioridad las anormalidades ocurridas. El atropello ha sido tan atroz que nos hemos visto precisados a acudir ante la Junta de Gobierno del Colegio de Abogados denunciando los hechos y solicitando el nombramiento de un abogado para este cliente.

'5. Que para la adecuada defensa del querellado es indispensable obtener una transcripción completa del caso en su fondo y de la moción de nuevo juicio del caso de Pueblo v. Roberto Arocho Maldonado y así lo solicita respetuosamente.'

Por resolución del Honorable Tribunal Supremo de Puerto Rico de 5 de febrero de 1976 el suscribiente fue designado Comisionado Especial. En cumplimiento de dicha designación y de las disposiciones de la Regla 13 del Reglamento del Tribunal Supremo procedimos a la celebración de una conferencia con antelación a la vista el día 27 de febrero de 1976, en cuya fecha la parte querellante compareció representada por el Procurador General Auxiliar, Lcdo. Ronaldo Rodríguez Ossorio. El querellado compareció personalmente. En dicha vista se ofrecieron como parte del expediente número 301 del Tribunal Supremo, y para conocimiento del querellado, las declaraciones juradas en que se funda la querella. Se propuso por la parte querellante enmienda al Cargo Número Dos en el sentido de alegar que el señor Eddie López Pacheco "recurrió ante el querellado", en sustitución de la frase "acudió a las oficinas del Lcdo. A Clavell Ruíz". El Comisionado Especial no aprobó la enmienda con vista de la oposición del querellado y por tratarse de una cuestión de prueba. Se aprobaron algunas enmiendas a la declaración jurada del querellado y se denegaron otras. Se ofreció prueba documental y se anunció la prueba testifical de que habrían de valerse las partes. Todo ello aparece en la minuta correspondiente al 27 de febrero de 1976 la cual, conforme nuestra Orden del 12 de marzo de 1976, constituye el acta de dicha conferencia.

La vista oral se celebró en el Salón de Sesiones del Tribunal Supremo de Puerto Rico los días 9 y 10 de junio y 2 de agosto de 1976, con asistencia del querellado y de su abogado Lcdo. Roberto de Jesús Cintrón y del Lcdo. Ronaldo Rodríguez Ossorio en representación de la parte querellante. Prestaron testimonio oral el Hon. Arturo Cintrón García, Juez del Tribunal Superior de Puerto Rico, Sala de Ponce, los señores Eddie López Pacheco,

Lcdo. Winston Laboy Milán, Tomás E. Alcalá, Lcdo. Rubén Rivera Vega, y el propio querellado Lcdo. José A. Clavell Ruíz. Los testigos de la parte querellante Leocadio Bonilla y Aida Millán no pudieron ser localizados por lo cual la representación legal de la parte querellante renunció a sus testimonios. Se ofrecieron por la parte querellante, en sustitución de sus testimonios, las declaraciones prestadas por estas personas durante la investigación. Dicha prueba no fue admitida por el Comisionado Especial por razón de que su admisión privaría al querellado de su derecho al contrainterrogatorio de dichos testigos. Se ofreció y admitió abundante prueba documental, la cual se relaciona en las minutas correspondientes a los distintos días de vista.

El querellado tuvo amplia oportunidad de conocer los cargos presentados en su contra; se le garantizó e hizo uso de su derecho a confrontarse con los testigos de la parte querellante, de presentar prueba testifical y documental en su defensa, de examinar toda la prueba documental presentada para sostener la querella; se le suministró, no solamente la declaración prestada por él durante la etapa investigativa, a la cual, según se ha expresado, inclusive tuvo oportunidad de sugerir enmiendas y aceptar o rechazar las enmiendas propuestas por la parte querellante; y, además, recibió el beneficio de las declaraciones prestadas por todos los testigos que habrían de ser presentados en su contra, y disfrutó, como clímax de todo el procedimiento, del beneficio de una vista pública.

Con vista de toda la prueba testifical y documental presentada y admitida, la cual hemos examinado y re-examinado varias veces, el Comisionado Especial formula las siguientes

## DETERMINACIONES DE HECHO:

(1) El Lcdo. José A. Clavell Ruíz fue admitido al ejercicio de la abogacía el 13 de diciembre de 1968 y al ejercicio del notariado el 4 de febrero de 1969. Durante el período a que se contraen los hechos que informan la querella y específicamente entre el 2 de mayo de 1972 y el 30 de junio de 1975, (Exhibits 7 y 29 del querellado) tenía establecido su despacho profesional en la Calle Lolita Tizol Núm. 345, frente a la cárcel de distrito de la Ciudad de Ponce. Simultáneamente, el querellado actuaba, mediante autorización del Comisionado de Seguros de Puerto Rico como apoderado de una compañía de fianzas denominada Compañía de Fianzas de Puerto Rico (Puerto Rico Bonding

268

Company) y en tal capacidad y mediante el cobro a los interesados de la prima correspondiente, autorizaba fianzas en causas criminales pendientes en las distintas Salas de la Sección de Ponce del Tribunal de Primera Instancia. Como parte de esta gestión el querellado tenía un rótulo en su despacho profesional, visible al público, anunciando la prestación de estos servicios. Utilizaba, además, una tarjeta de presentación como abogado-notario y como representante de la Compañía de Fianzas de Puerto Rico (Puerto Rico Bonding Company). (Exhibits 1-A y 1-B del querellante.)

(2) Como tal apoderado se le autorizó a suscribir, otorgar y expedir ante los Tribunales de Justicia de Puerto Rico fianzas judiciales en procedimientos de naturaleza criminal por las cuantías máximas permitidas a la Compañía de Fianzas de Puerto Rico (Puerto Rico Bonding Company), conforme la autorización expedídale por el Comisionado de Seguros, prohibiéndole:

(a) Expedir y otorgar fianzas de libertad provisional a favor de personas detenidas o acusadas por el delito de abandono de menores;

(b) Cobrar al interesado una prima mayor que la autorizada por el Comisionado de Seguros;

(c) Otorgar o suscribir fianzas sin recibir el pago de la prima correspondiente al momento de otorgarla; y

(d) Otorgar o suscribir la fianza sin obtener y anotar la dirección y circunstancias personales del fiado. (Exhibit 8 del querellante; Exhibit 7 del querellado). [1]

(3) Con motivo de la incomparecencia de varios acusados al Tribunal Superior de Puerto Rico, Sala de Ponce, en causas de naturaleza criminal en que las fianzas habían sido prestadas por el querellado como apoderado de la Compañía de Fianzas de Puerto Rico (Puerto Rico Bonding Company), el Magistrado, Hon. Arturo Cintrón García, dictó sendas órdenes requiriendo que el querellado produjera los acusados bajo apercibimiento de confiscación de las fianzas. Al no cumplir el quere-

---

[1] 'CANON 37—Participación del Abogado en Actividades Comerciales: La participación del abogado en negocios o actividades de venta de bienes, agencias de cobro, fianzas u otros servicios comerciales, propios o pertenecientes a otras personas no es una actividad propia de la buena práctica de la profesión si tal negocio o actividad tiene el fin directo o indirecto de proporcionarle trabajo profesional lucrativo que de otra forma el bufete no hubiese obtenido.'

llado con dicha orden el referido magistrado sostuvo con aquél una o varias reuniones y en forma amistosa y hasta paternalista, impetró de él que descontinuara la práctica de prestar dichas fianzas por constituir ello, según le indicó, una infracción a los cánones de ética profesional. El querellado alegó que él era solo apoderado de la compañía y que en todo caso resultaba ser ésta la responsable de cumplir con lo ordenado por el Tribunal. (Exhibit 1 del querellado; Exhibit 2 del querellante.)

(4) Con vista de la actitud negativa asumida por el querellado el Hon. A. Cintrón García dictó el 12 de septiembre de 1974 resolución en la causa criminal M74-461, El Pueblo de Puerto Rico v. William Mercado Rodríguez, por el delito de infracción a la Ley de Automóviles y Tránsito, refiriendo el asunto al Honorable Tribunal Supremo de Puerto Rico para la determinación correspondiente respecto a la conducta profesional del querellado en el área relativa a la prestación de fianzas como apoderado de la Compañía de Fianzas de Puerto Rico (Puerto Rico Bonding Company) así como en lo relativo a la formalización de un contrato de compraventa suscrito por el señor Eddie López Pacheco y por el querellado el día 25 de junio de 1974.

(5) Entre otras, el querellado, en su carácter de apoderado de la Compañía de Fianzas de Puerto Rico (Puerto Rico Bonding Company), prestó las fianzas en las causas criminales que a continuación se relacionan y asumió la representación legal de los acusados en las mismas:

(a) Pueblo v. Vicente Rodríguez, G73-978, por escalamiento en primer grado (Exhibit 4 del querellante);

(b) Pueblo v. Julio E. Rivera, G74-182 y 183, por infracción a la Ley de Substancias Controladas (Exhibit 7 del querellante);

(c) Pueblo v. Andrés Robles Santos, G74-807, por asesinato;

(d) Pueblo v. William Mercado Rodríguez, M74-461, por infracción a la Ley de Automóviles (Exhibit 11 del querellante);

(e) Pueblo v. Efraín de Hoyos Martínez, G74-683, por mutilación (Exhibit 9 del querellante);

(f) Pueblo v. Jesús M. Santiago, G75-86, G75-213, G75-221–223, G75-215–217–219 (Exhibit 10-A del querellante).

(6) En su carácter de apoderado de la Compañía de Fianzas de Puerto Rico (Puerto Rico Bonding Company) el querellado, por moción del 20 de agosto de 1974 en la causa G73-491–492 y

M73-721, El Pueblo v. Muriel, por los delitos de ataque para cometer asesinato e infracción artículos 6 y 8 de la Ley de Armas, respectivamente, solicitó y obtuvo del Tribunal (Hon. A. Cintrón García, Juez) el retiro o cancelación de las fianzas prestadas luego de demostrarse satisfactoriamente que el acusado se encontraba detenido en la Cárcel de Distrito de Ponce. En estos casos el querellado representó al acusado profesionalmente en la vista preliminar, en el acto de la lectura de acusación celebrado el día 15 de agosto de 1973. En la causa felony, prestó fianzas a su favor como apoderado de la Compañía de Fianzas de Puerto Rico (Puerto Rico Bonding Company) el 27 de abril de 1973, y lo representó en la solicitud sobre rebaja de fianzas radicada el 28 de abril de 1973, así como en la moción sobre retiro de fianzas de 20 de agosto de 1974 (Exhibits 3, 5 y 6 del querellante).

(7) La alegación básica del Licenciado Clavell es que la actuación del querellado con relación a la Compañía de Fianzas "es meramente la de suscribir los contratos de fianza que vengan ante su consideración, no teniendo responsabilidades ulteriores para dicha compañía". No obstante esta afirmación, contenida en su contestación a la querella, el querellado suscribió contrato con la Compañía de Fianzas de Puerto Rico (Puerto Rico Bonding Company) mediante Escritura de Poder Especial Número 3 otorgada ante el Notario Don J. L. Beaumont Sánchez, en San Juan, Puerto Rico, el día 2 de mayo de 1972, constituyéndose así en apoderado de la referida Compañía de Seguros [sic] de Puerto Rico (Exhibit 8 del querellante).

(8) Con posterioridad a la formulación de la querella, el querellado renunció como apoderado de la Compañía de Fianzas de Puerto Rico, siendo su esposa designada apoderada de dicha compañía. Su oficina ubica en el mismo edificio donde está situado el despacho profesional del Licenciado Clavell.

(9) No existe prueba creíble que demuestre que el Hon. Arturo Cintrón actuara en la forma en que lo hizo movido por animadversión, prejuicio o rencor contra el querellado. Por el contrario, las actuaciones de dicho magistrado demuestran su celoso cumplimiento del deber judicial y su benevolencia y simpatía para quien había sido su discípulo como estudiante de derecho y ahora era un compañero de profesión.

(10) El 28 de mayo de 1974 Eddie López Pacheco, residente

en Guayanilla y quien a la sazón trabajaba como guardia de seguridad, fue arrestado por el delito de violación e ingresado en la Cárcel de Distrito de Ponce. Allí conoció al querellado, quien le ofreció sus servicios profesionales; conviniendo ambos en que el querellado lo asistiría en la vista preliminar y a los fines de una solicitud sobre rebaja de fianza. El querellado no compareció a la vista preliminar señalada para el día 13 de julio de 1974. En esa fecha la fianza de $25,000.00 que le había sido fijada al acusado le fue aumentada a la suma de $50,000.00. No obstante, y como resultado de solicitud de hábeas corpus presentada por el querellado, la fianza le fue rebajada a $3,000.00 el propio día 13 de julio de 1974 (Hon. Felipe Marchand, Juez).

(11) Luego de prestarse la fianza por el querellado como apoderado de la Compañía de Fianzas de Puerto Rico (Puerto Rico Bonding Company), o sea, el día 28 de junio [*sic*] de 1974 [*sic*], comparecieron el querellado y el señor Eddie López Pacheco ante el Lcdo. Winston Laboy Milán y otorgaron un contrato de compraventa a virtud del cual dicho Eddie López Pacheco vendió, cedió y traspasó al querellado una casa de madera, techada de zinc, radicada en el Barrio Sitios, Calle Roberto Santana Núm. 3 del término municipal de Guayanilla, Puerto Rico. Dicha casa radicaba en un solar propiedad del Municipio de Guayanilla. El supuesto vendedor carecía de documento o título demostrativo de ser el dueño de la propiedad (Exhibit 19 del querellado).

(12) La referida compraventa se efectuaba, según el documento traslativo del dominio, por la suma de $2,500.00, cuya suma admitía haber recibido el vendedor en la misma fecha pero con anterioridad al otorgamiento del documento; disponiéndose, adicionalmente, que el comprador entraría en posesión del inmueble una vez transcurrido el término de sesenta días. El documento o contrato de compraventa se adhirió a una carátula de escritura del Notario Laboy Milán, en la cual se consigna, en el espacio correspondiente al número de la escritura, "Affidavit Número 533". Toda la demás información, según surgía de su faz, sugería el otorgamiento de una escritura pública y no un documento privado de compraventa. En ningún momento durante la preparación y otorgamiento del contrato de compraventa el querellado y/o Eddie López Pacheco le informaron al Lcdo. Winston Laboy Milán que se trataba de un contrato de dación en pago y no de una legítima compraventa. El propio

querellado admitió que no entregó a López Pacheco suma alguna como precio de venta y que se trataba de una venta simulada. Es evidente que al querellado le constaba la diferencia entre la figura jurídica conocida como contrato de compraventa y la de dación en pago. No obstante, incumplió su obligación ética y profesional de explicar a López Pacheco los elementos y alcances de ambos conceptos jurídicos a los fines de que se siguiera el camino de la verdad y no el de la simulación (véase testimonio oral del Licenciado Clavell).

(13) Varios días después Eddie López Pacheco se personó en la propiedad y observó un letrero o anuncio mediante el cual se ofrecía la casa en venta, refiriendo a cualquier posible comprador a informarse con el querellado en su dirección en la Calle Lolita Tizol. López Pacheco removió el letrero y tomó posesión de la misma, la cual desde entonces ocupa. Algún tiempo después López Pacheco reunió la suma de $180.00 como resultado de aportaciones que le hicieran una hermana suya residente en la Ciudad de Nueva York y varias personas, cuya suma entregó al Licenciado Clavell. Mientras tanto, el querellado se enteró que la casa no pertenecía a López Pacheco y sí a varios familiares de éste que la reclamaban.

(14) El testimonio oral de Eddie López Pacheco, el cual nos merece entero crédito, demuestra que como él no disponía de dinero para pagarle al querellado por sus servicios profesionales le propuso a éste que le traspasaría la casa por la suma de $2,500.00. No obstante, y sin notificar al querellado, contrató los servicios del Licenciado Baragaño por la suma de $2,000.00 para que lo representara. Finalmente, fue el Licenciado Zayas Puig quien lo representó en la vista de la causa por el delito de violación. El acusado personalmente y por conducto de dicho letrado hizo alegación de culpabilidad.

(15) Al dirimir la prueba relativa al cargo número 2 de la querella, tomando en consideración la forma de declarar los testigos, Lcdo. José A. Clavell y Eddie López Pacheco, el carácter de sus testimonios, sus motivos, prejuicios, y los demás factores que producen certeza en la conciencia no prevenida del juzgador de los hechos, llegamos a la conclusión firme y definitiva de que el traspaso de la propiedad al querellado se hizo:

(a) Para garantizarle el pago de la prima de la fianza.

(b) Para pagar los honorarios profesionales del querellado.

(c) Para pagar al querellado honorarios de abogado que éste nunca prestó a dicho Eddie López Pacheco.

(16) La candidez y sinceridad de Eddie López Pacheco al admitir que fue él quien propuso al querellado el traspaso de la propiedad en pago de sus servicios profesionales por carecer de dinero para pagar por dichos servicios, constituye un factor de poderosa fuerza persuasiva, en tanto en cuanto tiende a demostrar, inequívocamente, su credibilidad y por ende la nulidad del contrato de compraventa, por constituir el mismo una mera simulación a la cual consintió, indebidamente, el propio querellado. Y lo hizo, según aparece de su propio testimonio, no solo con plena conciencia de la impropiedad de su proceder y con absoluto desprecio de la conducta ética per se, sino de la verdad jurídica a la cual debió ceñirse, en protección de su propia reputación profesional así como en protección del propio Eddie López Pacheco, ingenua víctima de su simulación. A decir del propio querellado, la transacción se hizo así para aprovechar unos impresos y por no anticipar problemas.

(17) El querellado ha otorgado varios cientos de fianzas como apoderado de la Compañía de Fianzas de Puerto Rico (Puerto Rico Bonding Company) y en un número de casos (alrededor de 25) se ha desempeñado también como abogado de los acusados y a nombre y en representación de éstos ha realizado ante los tribunales distintas gestiones tales como solicitudes de reducción de fianzas mediante moción o vía solicitud de "habeas corpus" representándolos en la vista preliminar, en el acto de lectura de acusación y en el juicio, así como en solicitud de suspensión de vista (Exhibits 8, 9, 11, 13, 21, 23, 27 del querellado).

(18) Leocadio Bonilla estaba recluido en la Cárcel de Distrito de Ponce como resultado de una convicción por el delito de incesto. El querellado se entrevistó con el recluso en la propia cárcel de Distrito de Ponce, donde discutieron la posibilidad de presentar ante el Tribunal una solicitud con el propósito de anular la sentencia. Como Bonilla no disponía de dinero, y enterado el querellado que aquel era dueño de una casa sita en la Urbanización Jaime Cruz, solicitó de él el pago de honorarios. Bonilla autorizó al querellado a vender la referida casa por una suma

que podría fluctuar entre un mínimo de $6,000.00 y $8,000.00, de cuyo precio de venta el querellado recibiría un 15% por concepto de comisión más los gastos de otorgamiento de la escritura. Transcurridas varias semanas se formalizó la venta por la suma de $7,500.00.

(19) Con motivo de que, según resulta del testimonio del señor Tomás E. Alcalá, Bonilla insistía en que la suma equivalente al 15% del precio de venta de la casa incluía los servicios profesionales del querellado y éste sostenía, por el contrario, que solo incluía el importe de la comisión y los gastos de escritura, el señor Superintendente de la Cárcel de Distrito de Ponce se reunió con ellos y allí convinieron en que el querellado solo cobraría la suma total de $800.00 y que le devolvería a Bonilla, por conducto del señor Alcalá, la suma de $6,700.00. Por carta del 18 de julio de 1974 el querellado remitió cheque por la indicada suma habiéndosele expedido el correspondiente recibo. (Exhibits 11 y 12 del querellante.) El querellante [sic], debe consignarse no le prestó a Bonilla servicio profesional alguno.

(20) En ausencia del testimonio oral del señor Leocadio Bonilla y el de la señora Millán, quienes no comparecieron a la vista por encontrarse, según la información ofrecida al Comisionado Especial, fuera de Puerto Rico, nos vemos imposibilitados de formular determinaciones de hecho adicionales con respecto al Tercer Cargo contenido en la querella. Los testimonios orales del señor Tomás E. Alcalá y del propio querellado, resultan insuficientes, a nuestro juicio, para formular tales determinaciones de hecho adicionales. Y ello es así, porque la prueba ofrecida y admitida deja serias dudas en nuestro espíritu con respecto a si en realidad de verdad se produjo entre Leocadio Bonilla y el querellado un contrato simulado con contornos similares a los del caso de López Pacheco, o si se trató, como sostiene el querellado, de un contrato de corretaje acordado entre ambos.

(21) La reiterada y esciente conducta del querellado al actuar como apoderado de la Compañía de Fianzas de Puerto Rico (Puerto Rico Bonding Company) y simultáneamente como abogado de un número de acusados a quienes representó, y simular en una ocasión un contrato de compraventa para encubrir una transacción de servicios profesionales, estableció en el querellado un patrón de conducta orientada hacia un evidente afán de lucro,

que no cedió, ni ante la discreción, prudencia y circunspección que le imponían las circunstancias, ni ante las amonestaciones de su maestro y amigo, el Hon. Juez Arturo Cintrón García.

Respetuosamente sometido.

Humacao, Puerto Rico, a 7 de julio de 1977.

(Fdo.) JOSE DAVILA ORTIZ

Comisionado Especial
Apartado Núm. 216
Teléfono 852-0713
Humacao, Puerto Rico
00661"

El análisis total de la prueba documental y testifical sostiene a cabalidad las determinaciones de hecho antes relacionadas. Las mismas reflejan una conducta reñida con los deberes y atributos éticos que deben animar a todo abogado que opta por desempeñarse en otras actividades, según el espíritu y contenido del Canon 37 vigente.

*Se dictará sentencia separando al querellado de la profesión de abogado indefinidamente.*

Los Jueces Asociados Señores Rigau, Díaz Cruz e Irizarry Yunqué no intervinieron.